IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| The Estate of LOIS MELIN, by its executor CATHY JAGER, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 14 C 1238 |
| v. | ) ) | Judge Joan B. Gottschall |
| WASHINGTON NATIONAL INSURANCE COMPANY, Successors in Interest to Pioneer Life Insurance Company, | ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The predecessor to Washington National Insurance Company issued a home health care policy (the "Policy") to Lois Melin more than twenty years ago.[1] In her second amended complaint, which is styled as a class action, Melin contends that Washington National wrongfully limited a provision that escalates benefits 8% per year to her daily home health care benefit, which started at $90 per day. According to Melin, Washington National should also have increased other benefits in the Policy by 8% per year. Washington National seeks to dismiss Melin's complaint, arguing that her interpretation of the Policy is at odds with Illinois law. For the following reasons, Washington National's motion to dismiss is denied.

---

[1] Cathy Jager, the executor of Melin's estate, is pursuing this case on Melin's behalf following Melin's death. The court previously permitted the filing of a second amended complaint substituting Jager for Melin. For clarity, the court will refer to the plaintiff as Melin. In addition, it will construe the motion to dismiss, which is directed at the first amended complaint, as being directed at the second amended complaint as the two iterations of the complaint are substantively identical.

## I. BACKGROUND[2]

**A. The Policy**

Melin purchased the Policy in January 1991 from Pioneer Life Insurance Company, which is Washington National's predecessor in interest. The Policy (which is attached to the second amended complaint) contains a "Benefits" section that applies to all policyholders, as well as a "Certificate Schedule" that is unique to each policyholder. The "Benefits" section includes four types of benefits that refer the policyholder to a corresponding section of the Certificate Schedule:

> A. **HOME HEALTH CARE:** We will pay 100% of the usual and customary charges for Home Health Care expenses if the care was pre-authorized. If the care was not pre-authorized we will pay 75% of the usual and customary charges for Home Health Care expenses incurred, up to 75% of the Daily Benefit Amount shown in the schedule. All benefits will be limited to the Per Occurrence Maximum Benefit for each injury or sickness and the Lifetime Maximum Benefit Amount for ALL injuries and sicknesses which are shown in the certificate schedule . . . .
>
> B. **AUTOMATIC DAILY BENEFIT INCREASE:** On each policy anniversary, we will increase the Home Health Care Daily Benefit payable under this policy by the Automatic Benefit Increase Percentage shown on the schedule page . . . .
>
> E. **PER OCCURENCE MAXIMUM BENEFIT:** No further benefits will be payable for sickness or injury when the total sum of Home Health Care or Adult Day Care of benefits for that occurrence equals the amount shown in the schedule for the Per Occurrence Maximum Benefit. Successive confinement due to the same or related cause not separated by at least six months of normal daily living will be considered as the same occurrence.
>
> F. **LIFETIME MAXIMUM BENEFIT:** This coverage shall terminate and no further benefits will be payable when the total sum of Home Health

---

[2] The following facts are drawn from the second amended complaint and will be accepted as true for the purposes of the motion to dismiss.

> Care or Adult Day Care benefits paid equals the amount shown in the schedule for the Lifetime Maximum Benefit Amount. Any premium paid for a paid for a period after termination will be refunded.

(Dkt. 27-1 at PageID #311-12.)

The Certificate Schedule in the Policy is on its own page and provides that:

### CERTIFICATE SCHEDULE

| | |
|---|---|
| HOME HEALTH CARE BENEFIT | $90/DAY |
| LIFETIME MAXIMUM BENEFIT AMOUNT | $250,000.00 |
| PER OCCURRENCE MAXIMUM BENEFIT | $75,000/ILLNESS |
| AUTOMATIC BENEFIT INCREASE PERCENTAGE | Benefits increase by 8% each year |

(*Id.* at PageID #309.)

**B.     Denial of Coverage**

In November 2012, Washington National began to deny claims made by Melin based on its finding that she had reached her Per Occurrence Maximum Benefit cap of $75,000. Melin contends that Washington National wrongfully limited the 8% annual increase to the Home Health Care Daily Benefit. According to Melin, the 8% annual increase also applied to the Per Occurrence Maximum Benefit cap and the Lifetime Maximum Benefit.

The second amended complaint attaches a letter dated April 24, 2013, from Melin's attorney to Washington National. (Dkt. 27-1 at PageID #322.) In the letter, Melin's attorney stated that Melin suffered from dementia and asked Washington National to reconsider its decision that Melin had exceeded the plan maximum for in home care based on the Per Occurrence Maximum Benefit cap. Counsel noted that Washington National had stated that

Melin could not receive further benefits until she had a "six month separation date" between times she received care and that this was impossible because "dementia is not something that someone recuperates from and has a separation period."[3] (*Id.*)

After Washington National adhered to its position regarding coverage, Melin filed suit in the Circuit Court of Kane County, Illinois. Washington National removed the case to federal court based on diversity jurisdiction, 28 U.S.C. § 1332(a), and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Melin, on behalf of a putative class, contends that Washington National breached the Policy by refusing to apply the 8% annual increase to the Lifetime Maximum and Per Occurrence benefits (Count I). She also seeks a declaratory judgment to this effect (Count II).

## II. STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies this pleading standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although

---

[3] Washington National's motion to dismiss attaches and discusses other letters sent by Melin's counsel regarding the denial of coverage. The court cannot consider these documents in connection with a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Geinosky v. City of Chicago*, 675 F.3d 743, (7th Cir. 2012) (" A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.")

conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

## III. DISCUSSION

Melin contends that pursuant to the doctrine of collateral estoppel, Washington National is bound by a judgment in favor of the insured in a prior Florida case involving Washington National and the 8% provision that is at issue in this case. Alternatively, she contends that the court should deny Washington National's motion to dismiss because the relevant portions of the Policy are ambiguous and can be read to support her claim that the 8% increase applies to all three types of benefits, not just the Home Health Care Daily Benefit.

### A. Collateral Estoppel

Melin states, without elaboration, that "[a]t this stage of the proceeding, the Court is not compelled to rule on the collateral estoppel issue." (Dkt. 25 at 1 n.1.) It is unclear why the court would reach the merits of the parties' arguments about contract interpretation without first deciding whether collateral estoppel prevents Washington Mutual from defending this case. The court thus turns to Melin's contention that collateral estoppel applies because Washington National has already "litigated this very same issue with the very same policy language before Florida's highest court and in the Eleventh Circuit." (Dkt. 25 at 5.)

#### 1. The *Ruderman* Decisions

*Ruderman ex rel. Schwartz v. Washington Nat'l Ins. Corp.*, 671 F.3d 1208 (11th Cir. 2012), involved the same issue and Policy language that are at issue in this case and was an

appeal from the grant of summary judgment in favor of the insured.[4] The Eleventh Circuit found that the Policy was ambiguous and that Florida law governing interpretation of the Policy was unsettled. *Id*. at 1211-12. Thus, the Eleventh Circuit certified the following question to the Florida Supreme Court:

> In this case, does the Policy's "Automatic Benefit Increase Percentage" apply to the dollar values of the "Lifetime Maximum Benefit Amount" and the "Per Occurrence Maximum Benefit"?
>
> We understand answering this question might include answering the three following sub-questions:
>
> A. Does an ambiguity exist about whether the Policy's "Automatic Benefit Increase Percentage" applies only to the "Home Health Care Daily Benefit" or whether it also applies to the "Lifetime Maximum Benefit Amount" and the "Per Occurrence Maximum Benefit"?
>
> B. If an ambiguity exists in this insurance policy—as we understand that it does—should courts first attempt to resolve the ambiguity by examining available extrinsic evidence?
>
> C. Applying the Florida law principles of policy construction, does the Policy's "Automatic Benefit Increase Percentage" apply to the "Lifetime Maximum Benefit Amount" and to the "Per Occurrence Maximum Benefit" or does it apply only to the "Home Health Care Daily Benefit"?

*Id*.

The Florida Supreme Court answered the certified question in *Washington Nat'l Ins. Co. v. Ruderman*, 117 So.3d 943, 945 (Fla. 2013). The Florida Supreme Court concluded that the Policy was ambiguous, and that the 8% benefit increase applied to the Lifetime Maximum

---

[4] The parties thoroughly discuss seven opinions in *Ruderman* issued by the Florida Supreme Court, the federal district court, and the federal appellate court. While this provided helpful background, this court will limit its discussion to the subset of *Ruderman* decisions that it believes are relevant to the pending motion to dismiss.

Benefit and Per Occurrence Maximum Benefit, as well as the Home Health Care Daily Benefit. *Id*. at 948-958. Based on the Florida Supreme Court's decision, the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of the insured. *Ruderman ex rel. Schwartz v. Washington Nat'l Ins. Corp.*, 731 F.3d 1188, 1189 (11th Cir. 2013).

### 2. Does *Ruderman* Have Preclusive Effect in This Case?

The doctrine of collateral estoppel, which is also known as issue preclusion, bars "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-749 (2001)). Melin asserts that Washington National was a party in *Ruderman* and that the outcome in *Ruderman* is binding and prevents Washington National from challenging the Florida courts' interpretation of the insurance policy that is at issue in this case.

Pursuant to the full-faith-and-credit statute, 28 U.S.C. § 1738, "federal courts must give state court judgments the same preclusive effect as a court in the rendering state, applying that state's law." *Gambino v. Koonce*, 757 F.3d 604, (7th Cir. 2014) (quoting *Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir. 2002) (internal quotation marks omitted)). Thus, this court must give the same preclusive effect to the *Ruderman* orders that Florida courts would, as Florida was the rendering state. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985) (citing 28 U.S.C. § 1738).

"Florida has traditionally required that there be a mutuality of parties in order for the doctrine to apply." E.C. v. Katz, 731 So .2d 1268, 1269 (Fla. 1999). "Thus, unless both parties are bound by the prior judgment, neither may use it in a subsequent action." *Id*.; *see also Union*

*Carbide Corp. v. Aubin*, 97 So.3d 886, 904 n.6 (Fla. Dist. Ct. App. 2012) ("non-mutual, offensive collateral estoppel . . . is impermissible in Florida"). Melin was not a party in *Ruderman*. Thus, collateral estoppel does not apply.

In any event, when the "legal rules governing a specific case or issue differ, collateral estoppel does not apply." *Wausau Underwriters Ins. Co. v. United Plastics Grp., Inc.*, No. 04 CV 6543, 2010 WL 538544, at *5 (N.D. Ill. Feb. 10, 2010); *see also Boomer v. AT & T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002) (there was no identity of issues between a case governed by California law and a subsequent case governed by Illinois law); 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4425 (2d ed. 2002) ("Identity of the issue is established by showing that the same general legal rules govern both cases" so collateral estoppel does not apply if the governing rules differ). In this case, Illinois law – not Florida law – governs. Thus, for this second reason, collateral estoppel does not apply. The court, therefore, turns to the parties' arguments about the Policy.

**B.     Washington Mutual's Motion to Dismiss**

    **1.     Illinois Law Governing the Interpretation of the Policy**

"Under Illinois law, interpretation of an insurance policy is a question of law." *Livingston v. Trustgard Ins.*, 988 F. Supp. 2d 873, 876 (N.D. Ill. 2013); *see also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). The meaning of a contract "must be determined from the words or language used" so "a court cannot place a construction on the contract which is contrary to the plain and obvious meaning of the language." *INEOS Polymers Inc. v. BASF Catalysts*, 553 F.3d 491, 489 (7th Cir. 2009) (quoting *McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000) (applying Illinois law). The

court's interpretation is "guided not by what the insurer intended but by what a reasonable person in the shoes of the insured would understand the policy to mean." *Indiana Ins. Co. v. Royce Realty and Mgmt., Inc.*, 990 N.E.2d 1244, 1252 (Ill. App. 2013) (citing *Aurelius v. State Farm Fire & Cas. Co.*, 894 N.E.2d 765, 769 (Ill. App. 2008)); *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp., Inc.*, 785 F. Supp. 2d 722, 727 (N.D. Ill. 2011).

When determining if provisions in an insurance policy are ambiguous, the court construes the contract as a whole. *Claire's Stores, Inc. v. Companion Life Ins. Co.*, No. 11 CV 2463, 2012 WL 769729, at *4 (N.D. Ill. Mar. 7, 2012) (citing *Flora Bank & Trust v. Czyzewski*, 583 N.E.2d 720, 725 (Ill. App. Ct. 1991)). "A contract . . . is not rendered ambiguous simply because the parties disagree upon its proper construction." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). Instead, it is ambiguous if it contains language that is "susceptible to more than one reasonable interpretation." *Livingston*, 988 F. Supp. 2d at 876 (citing *Outboard Marine*, 607 N.E.2d at 1212). If a policy's language is unambiguous, the court "may determine its meaning as a matter of law" as an "unambiguous contract controls over contrary allegations in the plaintiff's complaint." *McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d at 584; *see also Romo v. Fed. Nat'l Mortgage Ass'n*, No. 14 C 1891, 2014 WL 5620157, at *1 n.1 (N.D. Ill. Nov. 4, 2014) ("to the extent that the terms of an attached contract conflict with the allegations of the complaint, the contract controls").

## 2. Other Decisions Interpreting the Policy at Issue in This Case

The parties spend a considerable amount of time discussing the various decisions issued in the state and federal proceedings in the *Ruderman* case, which ultimately resulted in a decision in favor of the insured with respect to the 8% escalation clause. In the Florida Supreme Court

*Ruderman* decision, the majority held that "the various provisions in the policy, including the certificate schedule, demonstrated an ambiguity concerning whether the automatic increase applied only to the daily benefit or also applied to the lifetime maximum benefit amount and the per occurrence maximum benefit amount." *Ruderman*, 117 So. 3d at 947 (applying Florida law). In contrast, the dissent stated that:

> Nowhere does the policy provide for an increase to the Per Occurrence Maximum Benefit and the Lifetime Maximum Benefit Amount, which the majority correctly recognizes are caps on the total amount of daily benefits payable under the policy. *See* majority op. at 945-46. Moreover, the benefits section describes these to be caps, not benefits. The Home Health Care Benefits section of the policy states: "These benefits will be paid up to the Home Health Care Daily Benefit shown in the schedule. All benefits will be limited to the Per Occurrence Maximum Benefit for each injury or sickness and the Lifetime Maximum Benefit Amount for ALL injuries and sicknesses which are shown in the certificate schedule." This Benefits section does not include within its definitional scope the caps provided by the Per Occurrence Maximum Benefit and the Lifetime Maximum Benefit Amount as benefits. Had it done so, the policy would have applied the automatic benefit increase to the caps as well as to the daily benefit. But instead, the policy definition explicitly makes the benefits subject to, *not including*, the limits of those caps.

*Id*. at 952-53 (emphasis in original). The dissent concluded that when the Certificate Schedule and Policy were read together, the 8% annual increase only applied to the Home Health Care Daily Benefit. *Id*. at 954.

The parties also discuss two other cases against Washington National based on the applicability of the same 8% escalation clause that is at issue in this case. First, in *Rountree v. Washington Nat'l Ins. Co.*, No. 607 C 14, 2007 WL 1500293 (S.D. Ga. May 21, 2007), the court granted Washington National's motion to dismiss and denied the plaintiff's motion for summary judgment with respect to the plaintiff's breach of contract claim. As the *Rountree* court explained:

> [The definitions of "Per Occurrence Maximum Benefit" and "Lifetime Maximum Benefit Amount"] do not refer to the "Automatic Benefit Increase Percentage." They refer only to the "Per Occurrence Maximum Benefit" and the "Lifetime Maximum Benefit Amount," both of which are fixed amounts defined in the Schedule.
>
> Viewing the Policy as a whole, it is unambiguous that the definition of "Automatic Benefit Increase Percentage" in the Schedule did not apply to any of the benefit limits listed on the Schedule. It was merely a defined phrase to be referenced in the terms of the contract. Because the "Lifetime Maximum Benefit" contemplated by the Policy in subsection F on page 6 contains no reference to the "Automatic Benefit Increase Percentage," the 8% increase does not apply to the "Lifetime Maximum Benefit."

*Id*. at *4 (applying Georgia law).

Second, in *Gradinger v. Washington Nat'l Ins. Co.*, the district court applied Florida law and granted Washington National's motion for summary judgment, finding that the 8% escalation clause was unambiguous and applied only to the "Home Health Care Benefit." (Dkt. 24-3 at 7.) The plaintiff appealed. In an unpublished order that was withdrawn pursuant to the parties' settlement, the Eleventh Circuit focused on the Certificate Schedule and found that it could be interpreted to mean that the 8% escalation applies to the "Home Health Care Benefit" or all three types of benefits. *Gradinger v. Washington Nat'l Ins. Co.*, 250 Fed. Appx. 271, 274-75 (11th Cir. 2007) (per curiam). It then held that when the Certificate Schedule and the benefits section of the Policy were read together, the plaintiff had reasonably interpreted the Policy to mean that the annual increase would apply to all three types of benefits. *Id*. at 275.

### 3. Is the Policy Ambiguous?

As noted above, the existence of conflicting interpretations of the Policy based on Florida and Georgia law does not mean that the Policy is ambiguous under Illinois law; instead, it

reflects a disagreement about the legal issue of contract construction. *See Hampton*, 561 F.3d at 714. In this case, Melin contends that:

> the language of the Policy repeatedly refers the insured to the Certificate Schedule to determine the benefits payable under the Policy. The manner in which the Schedule lists the three benefits coupled with the language "Benefits increase by 8% each year" makes it reasonable for an insured to conclude all three benefits are increased.

(Dkt. 25 at 10.)

Focusing on the Certificate Schedule, the phrase "Automatic Benefit Increase Percentage[:] Benefits increase by 8% each year," when read in conjunction with the other listed benefits ("Home Health Care Benefit[:] $90/day", "Lifetime Maximum Benefit Amount[:] $250,000.00," and "Per Occurrence Maximum Benefit[:] $75,000/illness"), could most plainly be interpreted to mean that the annual increase applies to all three types of benefits. (Dkt. 27-1 at PageID #309.) However, an insured cannot "overcome [the definition section in an insurance policy] by focusing solely on the terms of [the] Schedule" as "the court need not consider the Schedule in isolation from the remainder of the policy." *Claire's Stores*, 2012 WL 769729, at *6 (citing *Reserve at Woodstock, LLC v. City of Woodstock*, 958 N.E.2d 1100, 1111 (Ill. App. Ct. 2011). Thus, the court must consider the Certificate Schedule and the definitions of the benefits provided under the Policy together.

Washington National argues that the Certificate Schedule cannot be read as anything but a series of specific numeric values that corresponds to the definitions of the various types of benefits in the Policy. The problem with this argument is that the paragraphs in the definition section refer the reader to the schedule as a whole. The schedule as a whole lists the amounts for

the three different benefits (the Home Health Care Daily Benefit, the Lifetime Maximum Benefit Amount, and the per Occurrence Maximum Benefit) and then ends with:

> AUTOMATIC BENEFIT INCREASE
> PERCENTAGE                              Benefits increase by 8% each year

(*Id*. at PageID #309.)

The definition section of the Policy outlines the "Home Health Care" benefit. That covers daily home health care and is "limited to the Per Occurrence Maximum Benefit for each injury or sickness and the Lifetime Maximum Benefit Amount for ALL injuries and sicknesses which are shown in the certificate schedule." (Dkt. 27-1 at PageID #311.) When one turns to the Certificate Schedule, it provides that the Home Health Care Daily Benefit is $90 per day, but at the bottom of the schedule, it states that the "automatic benefit increase percentage" is "8% each year." (*Id*. at PageID # 309.)

Reading on, the Policy states that the "Automatic Daily Benefit Increase" benefit means that "[o]n each policy anniversary, we will increase the Home Health Care Daily Benefit payable under this policy by the Automatic Benefit Increase Percentage shown on the schedule page." And once again turning to the Certificate Schedule, the Automatic Benefit Increase Percentage is defined as 8%. (*Id*.) And once again, at the bottom of the schedule, it states that the "automatic benefit increase percentage" is "8% each year." (*Id*.)

The "Per Occurence Maximum Benefit" states that "[n]o further benefits will be payable for sickness or injury when the total sum of Home Health Care or Adult Day Care of benefits for that occurrence equals the amount shown in the schedule for the Per Occurrence Maximum Benefit." (*Id*. at PageID # 312.) The Certificate Schedule defines the Per Occurrence Maximum

Benefit amount as $75,000 per illness, but on the same page – apparently referring to all three types of benefits – states that the "automatic benefit increase percentage" is "8% each year." (*Id*. at PageID # 309.)

Finally, the "Lifetime Maximum Benefit" provision provides that "[t]his coverage shall terminate and no further benefits will be payable when the total sum of Home Health Care or Adult Day Care benefits paid equals the amount shown in the schedule for the Lifetime Maximum Benefit Amount." (*Id*. at PageID # 312.) The Certificate Schedule defines the Lifetime Maximum Benefit Amount as $250,000, immediately above the statement that the "automatic benefit increase percentage" is "8% each year." (*Id*. at PageID # 309.)

It is true that the Automatic Home Health Care Daily Benefit is the only benefit that specifically refers to the Automatic Benefit Increase Percentage. However, all of the other benefits refer the reader to the Certificate Schedule, which – once again – culminates with the statement that the "automatic benefit increase percentage" is "8% each year." (*Id*..) As the Eleventh Circuit held when finding that the Policy was ambiguous and certifying a question to the Florida Supreme Court:

> the Policy is ambiguous about whether the Lifetime Cap and Per Occurrence Cap increase each year or whether only the Daily Benefit increases each year. The way the "Benefits" section of the Policy and the Certificate are drafted, it is reasonable to read the Certificate language "Benefits increase by 8% each year" as applying solely to the Daily Benefit; but it is also reasonable to read the Certificate language to mean that all the amounts listed within the Policy's "Benefits" section—including the "Per Occurrence Maximum Benefit" and the "Lifetime Maximum Benefit"—increase annually.

*Ruderman ex rel. Schwartz v. Washington Nat'l Ins. Corp.*, 671 F.3d 1208, 1211 (11th Cir. 2012).

This court agrees. As discussed above, "[a] contract must be construed as a whole, viewing each provision in light of the other provisions." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011); *see also Reserve at Woodstock*, 958 N.E.2d at 1111 (a court may not ascertain the parties' intent "by viewing a clause or provision in isolation, or by looking at detached portions of the contract"). A reasonable person in the position of the insured could easily read the policy language to reflect the insurer's agreement to increase all three types of benefits by 8% per year. *See Archer Daniels Midland Co.*, 785 F. Supp. 2d at 727. This is not the *only* reasonable interpretation, but it is *a* reasonable interpretation. Perhaps "a sophisticated reader of insurance policies" would agree with Washington National's interpretation, but this is not the relevant standard, as Illinois' "public policy . . . requires that insurance contracts be construed and enforced to accord with the objectively reasonable expectations of the insured." *Posing v. Merit Ins. Co.*, 629 N.E.2d 1179, 1183 (Ill. App. 1994). The insured should not have to hire a lawyer to purchase an insurance policy.[5]

Given that it is reasonable to interpret the Policy as Melin suggests, the court joins the courts that have ruled against Washington National, and finds that the relevant portions of the Policy are ambiguous. The motion to dismiss the second amended complaint is, therefore, denied.

## IV. CONCLUSION

For the above reasons, defendant Washington National Insurance Company's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) [23] is denied. Washington National shall file its

---

[5] The court notes that whatever the insurance policy is supposed to mean in this context, making it clear would not be difficult and is something the drafters could and should have accomplished.

answer by April 7, 2015. A status hearing is set for April 10, 2015, at 9:30 a.m.


Date: March 17, 2015                              /s/
                                        Joan B. Gottschall
                                        United States District Judge